1999 ND 216

**In the Interest of D.F.G. and E.K.B., Children.**

**Constance Cleveland, Petitioner and Appellee,**

v.

**Director, Cass County Social Services, F.B., D.F.G., E.K.B., and Steve Mottinger, Guardian ad Litem, Respondents,**

**R.G., Respondent and Appellant.**

**No. 990104.**

Supreme Court of North Dakota.

Dec. 1, 1999.

Constance L. Cleveland, Assistant State's Attorney, Fargo, ND, for petitioner and appellee.

Joe A. Johnson, Fargo, ND, for respondent and appellant.

KAPSNER, Justice.

[¶ 1] R.G. ("Rebecca," a pseudonym) appealed from the juvenile court's order terminating her parental rights to her son, D.F.G. ("David," a pseudonym). Because there is clear and convincing evidence David is deprived, the deprivation is not due primarily to a lack of financial resources, the conditions and causes of the deprivation are likely to continue, and David is suffering or in the future probably will suffer serious physical, mental, or emotional harm, we affirm.

I.

[¶ 2] Rebecca is the mother of David and E.K.B. ("Ellen," a pseudonym). David was born on April 30, 1986. His father is deceased. Ellen was born on March 18, 1992. Rebecca's parental rights to Ellen are not at issue because during the proceedings in juvenile court jurisdiction over Ellen was transferred to the Court of Central Jurisdiction for the Mille Lacs Band of Chippewa Indians in Minnesota.

[¶ 3] In April 1996, the YWCA shelter referred Rebecca to Southeast Human Service Center. Dr. Elizabeth Faust, a psychiatrist at Southeast Human Service Center, examined Rebecca and concluded Rebecca suffers from alcohol addiction and

bipolar disorder. Rebecca began treatment for her alcohol addiction on April 29, 1996. On May 21, 1996, at Rebecca's request, David and Ellen were placed in the custody of Cass County Social Services. Rebecca left the YWCA at the end of May and quit attending treatment sessions.

[¶ 4] The State filed a petition alleging David and Ellen were deprived. In July 1996, following a hearing at which Rebecca had counsel, the juvenile court found the children were deprived and ordered them placed in the custody of Cass County Social Services. Rebecca returned for treatment at Southeast Human Service Center on July 30, 1996. She received counseling for her alcohol addiction and psychiatric services for her mental health problems, but she soon dropped out of the treatment program.

[¶ 5] In January 1997, a hearing for review of custody was held. Rebecca did not attend the hearing, but Rebecca's attorney did attend. The juvenile court found the children continued to be deprived and ordered the children remain in the temporary custody of Cass County Social Services.

[¶ 6] Rebecca returned to Southeast Human Service Center for treatment on March 6, 1997. The treatment concentrated on preventing relapses and dealing with personality issues. In early September 1997, David returned to Rebecca's physical custody. Shortly thereafter, Ellen returned to Rebecca's physical custody. In October 1997, Rebecca left the children with her former husband and went out to a bar with some friends. During the evening, Rebecca requested a ride from a former boyfriend who had been physically abusive to her. He and Rebecca apparently quarreled, and he ran over Rebecca with his car, breaking her leg. The following day, Ellen and David were returned to the custody of Cass County Social Services. After overdosing on prescribed medication in November 1997, Rebecca was committed to the North Dakota State Hospital. She stayed there until December 25, 1997, receiving counseling and other treatment.

[¶ 7] On January 8, 1998, another hearing for review of custody was held. Rebecca and her attorney attended the hearing. Finding the situation unchanged, the juvenile court ordered the children remain in the custody of Cass County Social Services. During the first few months of 1998, Rebecca made some progress in her rehabilitation. However, her attendance at daily treatment sessions grew inconsistent. On May 6, 1998, Rose Beck, Rebecca's addiction counselor, recommended treatment stop because of Rebecca's poor attendance and lack of cooperation. On July 2, 1998, another review of custody was held. Rebecca and her attorney attended the hearing. The juvenile court again found deprivation and ordered the children remain in the custody of Cass County Social Services.

[¶ 8] On August 5, 1998, a petition for termination of Rebecca's parental rights was filed. A trial to determine whether Rebecca's parental rights to David and Ellen should be terminated took place on November 19 and 20, 1998, and March 5, 1999.[1] Several witnesses testified at the trial, including two psychiatrists, a psychologist, a licensed addiction counselor, two social workers, an assessment worker for Cass County Social Services, the director of the YWCA shelter, and Rebecca.

[¶ 9] The juvenile court found: Rebecca's chemical dependence and mental health adversely affect her ability to provide stability and safety for David; David has special needs and is deprived; Rebecca's mental health problems and alcohol dependence cause the deprivation and are

---

1. After the proceedings on November 20, 1998, the juvenile court allowed a continuance so a representative of the Mille Lacs Band of Chippewa Indians could attend the final day of the trial. On March 5, 1998, the juvenile court granted a motion to transfer jurisdiction of the case involving Ellen to the Court of Central Jurisdiction for the Mille Lacs Band of Chippewa Indians in Minnesota.

likely to continue; and David is suffering or will probably suffer serious physical, mental, moral or emotional harm because of the instability of his parental home. On March 22, 1999, the juvenile court entered an order terminating Rebecca's parental rights to David, and Rebecca appealed.

## II.

[¶ 10] Although parents have constitutional protections in the relationship with their biological children, the relationship is not absolute or unconditional. *In the Interest of A.S.*, 1998 ND 181, ¶ 14, 584 N.W.2d 853. Due process requires certain procedural protections before the relationship may be terminated. *Id.*

[¶ 11] Section 27–20–44(1)(b) (1991),[2] N.D.C.C., provides "[t]he court by order may terminate the parental rights of a parent with respect to his child if ... [t]he child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." The statute creates a three-part test: 1) Is the child deprived? 2) Are the conditions and causes of the deprivation likely to continue? 3) Is the child suffering, or will the child in the future probably suffer serious physical, mental, moral, or emotional harm? *In the Interest of A.M. & C.M.*, 1999 ND 195, ¶ 7, 601 N.W.2d 253. The State must prove all three parts of the test by clear and convincing evidence. *In the Interest of A.S.*, 1998 ND 181, ¶ 15, 584 N.W.2d 853.

[¶ 12] In *In the Interest of A.S.*, 1998 ND 181, ¶ 13, 584 N.W.2d 853 (citing N.D.C.C. § 27–20–56(1)) (citations omitted), we explained our standard of review for cases involving termination of parental rights:

On appeal, we review the juvenile court's decision to terminate parental rights and examine the evidence in a manner similar to a trial de novo. We will review the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. Although the review is similar to trial de novo, we give deference to the juvenile court's decision, because that court has had the opportunity to observe the candor and demeanor of the witnesses.

### A.

[¶ 13] A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." *In the Interest of A.S.*, 1998 ND 181, ¶ 16, 584 N.W.2d 853 (citing N.D.C.C. § 27–20–02(5)(a)).

[¶ 14] Here, substantial evidence demonstrates David is a deprived child because Rebecca has not been able to provide David with adequate stability and care. Rebecca has repeatedly failed to control her alcohol addiction. Citing *Nefzger v. Nefzger*, 1999 ND 119, 595 N.W.2d 583, Rebecca argues alcoholism does not pose an absolute bar to a parent obtaining custody of a child. In *Nefzger* though, "several witnesses ... testified [the parent's] drinking did not interfere with her care of the children." *Id.* at ¶ 13. Here, the evidence demonstrates Rebecca's drinking, along with her mental illness, prevents her from providing adequate care for David.

---

**2.** The Legislature amended N.D.C.C. ch. 27–20 effective August 1, 1999. Because we do not retroactively apply statutes unless directed to do so by the Legislature, here we will apply the 1991 versions of N.D.C.C. § 27–20– 44 and the other pertinent sections of N.D.C.C. ch. 27–20. *State v. Davenport*, 536 N.W.2d 686, 688 (N.D.1995) (citing N.D.C.C. § 1–02–10).

[¶ 15] Rebecca has repeatedly placed David in the custody of social services. *See In the Interest of A.M. & C.M.*, 1999 ND 195, ¶ 8, 601 N.W.2d 253, (noting one child "had spent 35 of her first 51 months in foster care" and the other child "had spent over one-third of her life in homes other than with her parents"). Except for the brief period during September 1997, when David was returned to Rebecca's custody, David has been in the custody of Cass County Social Services since May 21, 1996. Rebecca admitted she had previously placed her children in the custody of Hennepin County Social Services. Rebecca suggests her use of social services should be commended rather than being considered support for termination. She asserts if a parent's decision to use social services will be used against the parent in a later termination proceeding, there would be a chilling effect on a parent's choice to seek help from social services. A parent temporarily needing assistance should be commended for opting to place a child in the custody of social services; however, when a parent repeatedly places the child in the custody of social services and the child is in such custody for several years, this shows more than a mere temporary need for assistance and may reflect the parent's inability or unwillingness to provide adequate care for the child. *In the Interest of J.L.D.*, 539 N.W.2d 73, 78 (N.D.1995) (noting "[h]owever commendable may be [the father's] desire to change his life and to learn how to become a parent for [the child], we are unwilling to let [the child] suffer the predictable consequences when it turns out that [the father] is unable, unwilling, or unavailable to do so").[3]

[¶ 16] Rebecca has frequently moved. During the past four years, she has lived in at least five different cities and at least five different residences within Fargo. She has resorted to living at the Fargo YWCA shelter three times since 1996. A parent's frequent moving is evidence of the parent's inability to provide a stable environment for a child. *In the Interest of L.F.*, 1998 ND 129, ¶ 14, 580 N.W.2d 573.

[¶ 17] Other incidents demonstrating Rebecca's lack of stability include her overdosing on prescription drugs and being committed to the State Hospital, her associating with an abusive former boyfriend shortly after her children were returned to her custody, and her receiving at least two DUI convictions.

[¶ 18] David has special needs which are exacerbated by Rebecca's inability to provide stability. Dr. Emmet Kenney, a psychiatrist, diagnosed David as having attention deficit/hyperactivity disorder. He explained David requires a "very predictable environment" and "[e]motional stability" is very important for his caregiver. Dr. Kevin Schumacher, a psychologist, diagnosed David as having disruptive behavior disorder. He indicated David has special needs and "instability" and "inconsistency" in parenting would be "incredibly destructive" to David. Rota Klava, a licensed social worker, testified David needs structure and needs "to know what comes next."

[¶ 19] In light of Rebecca's inability to provide a stable environment for David and David's special needs, there is clear and convincing evidence David is a child without the proper care and control necessary for his physical, mental, emotional, and moral well-being. Further, no evidence suggests the deprivation is due primarily to a lack of financial resources. At custody review hearings, Rebecca repeatedly stipulated David was deprived

---

3. Although not applicable retroactively here, the Legislature recently recognized consistent reliance on social services may evidence a parent's inability to provide adequate care for a child. Under N.D.C.C. § 27–20–44(1)(b)(2) (1999), termination is proper where the child is a deprived child and "[t]he child has been in foster care, in the care, custody, and control of the department, or a county social service board ... for at least four hundred fifty out of the previous six hundred sixty nights."

and the deprivation was not due primarily to a lack of financial resources. We therefore conclude David is a deprived child and the deprivation is not due primarily to a lack of financial resources.

### B.

[¶ 20] To determine whether the conditions and causes of the deprivation are likely to continue, evidence of past or present deprivation alone is insufficient, but evidence of the parent's background, including previous abuse or deprivation, may be considered. *In the Interest of L.F.*, 1998 ND 129, ¶ 16, 580 N.W.2d 573. The amount of contact the parent has had with the child may also be considered. *In the Interest of A.S.*, 1998 ND 181, ¶ 20, 584 N.W.2d 853 (noting the parent's lack of contact with the child was troubling). Prognostic evidence or evidence that forms the basis for a reasonable prediction as to future behavior must be evaluated. *In the Interest of J.L.D.*, 539 N.W.2d 73, 77 (N.D. 1995). Prognostic evidence includes the reports and opinions of the professionals involved. *Id.* at 77–78.

[¶ 21] Here, the evidence indicates the conditions and causes of the deprivation are likely to continue. Rebecca's history of failing alcohol and mental health treatment attempts and of placing David in social services' custody suggests David's deprivation will continue. *See In the Interest of A.M. & C.M.*, 1999 ND 195, ¶ 9, 601 N.W.2d 253, (noting there was "evidence of some efforts by [the parent] to overcome her problems, but the results of those efforts were not successful, despite the assistance from several social service agencies[,] and are insufficient to predict the future well-being of these children"); *see also In the Interest of R.M.B.*, 402 N.W.2d 912, 918 (N.D.1987) (indicating "[a]lthough lack of parental cooperation is insufficient by itself to establish deprivation, it is pertinent to the issue of whether deprivation will continue").

[¶ 22] In addition to Rebecca's history, significant prognostic evidence shows the deprivation is likely to continue. Dr. Faust, a psychiatrist and the Medical Director of Southeast Human Service Center, indicated Rebecca's mental health and alcohol problems would very likely continue to prevent Rebecca from parenting in the future. She explained Rebecca's alcohol addiction and mental disorder are "illnesses which affect judgment, ... emotional regulation, decision making, and behavior," and if untreated "will undoubtedly impact on any individual[']s ability to make good parenting decisions."

[¶ 23] Roger Flynn, a clinical social worker for Cass County Social Services, concluded David would again suffer a lack of stability and predictability if he was returned to Rebecca's custody. Although Flynn struggled with the decision to seek termination of Rebecca's parental rights, he concluded "as much as she cares about the kids, its [sic] my opinion its [sic] beyond her capability."

[¶ 24] Lisa Stremick, assessment worker for Cass County Social Services, indicated the deprivation likely would continue. Emphasizing Rebecca's inability to conquer her alcohol and mental health problems, Stremick stated Rebecca is not able to parent the children. Stremick believed Rebecca's problems and their effect on her children were likely to continue, and in her view, "the children deserve a chance at a stable life."

[¶ 25] Rose Beck, a licensed addiction counselor and a former employee of Cass County Social Services, believed Rebecca's alcohol problems would continue. Beck testified Rebecca failed to complete her chemical treatment plan and agreed Rebecca was "an untreated individual with chemical dependency."

[¶ 26] Rebecca's own testimony suggests the causes of David's deprivation will continue. She conceded she had failed to complete at least fifteen different treatment plans for her alcohol problem and agrees she has not been successfully treated for alcoholism. Nevertheless, Rebecca

has indicated she does not require treatment for either her alcohol problem or her mental health problems. Regarding her alcohol problem, Rebecca said, "treatment is not the answer. People place so much importance on treatment. It's not the answer. If I decide to quit, I decide to quit."

[¶ 27] We conclude there is clear and convincing evidence the causes and conditions of David's deprivation are likely to continue.

### C.

[¶ 28] To determine whether the child is suffering or will in the future probably suffer serious physical, mental, moral, or emotional harm, a showing of parental misconduct without showing a resultant harm to the child is insufficient. *In the Interest of A.S.*, 1998 ND 181, ¶ 31, 584 N.W.2d 853. The likelihood of serious mental and emotional harm to the child may be shown by prognostic evidence. *Id.* The statute does not require the deprivation be "continuous or irremediable." *Id.* at ¶ 32.

[¶ 29] The evidence shows David is suffering or likely will suffer serious mental and emotional harm in the future. Dr. Kenney and Dr. Schumacher both testified David needs a predictable, stable environment and caregiver and indicated a lack of stability and predictability would be very harmful to David's development. Although he did not treat Rebecca, Dr. Kenney also noted if a parent with bipolar disorder did not seek treatment, the parent would compromise her ability to deal with a child like David because bipolar disorder is characterized by "significant mood swings that affect judgment."

[¶ 30] The testimony of the professionals who dealt with Rebecca suggests her inability to provide a stable environment for David would likely continue to harm him. Dr. Faust, Roger Flynn, Lisa Stremick, and Rose Beck testified Rebecca has mental health and alcohol problems which would likely continue to cause harm to David's mental and emotional development.

[¶ 31] Because Rebecca is unable now or in the foreseeable future to provide a stable and predictable environment for David, we conclude there is clear and convincing evidence David suffers serious mental and emotional harm and will likely continue to suffer serious mental and emotional harm.

### III.

[¶ 32] The record shows clear and convincing evidence David is deprived, the deprivation is not due primarily to a lack of financial resources, the causes and conditions of David's deprivation will likely continue, and David is suffering or will likely suffer serious mental and emotional harm. We therefore affirm the juvenile court's decision to terminate Rebecca's parental rights to David.

[¶ 33] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, WILLIAM A. NEUMANN, MARY MUEHLEN MARING, JJ., concur.